# In the United States Court of Federal Claims
No. 18-419L

(Filed:  August 14, 2019)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| **FRANK LABRUZZO, et al.**, | Takings claim; Louisiana Commandeering Order responding to Hurricane Katrina; jurisdiction; effect of prior state suits; post-emergency federal action prompting permanent taking claim |
| Plaintiffs, | |
| v. | |
| **UNITED STATES**, | |
| Defendant, | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Charles G. Justice, III, New Orleans, Louisiana, for plaintiffs.

Jessica M. Held, Trial Attorney, Natural Resources Section, Environmental & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs was Jean E. Williams, Deputy Assistant Attorney General, Environmental & Natural Resources Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Senior Judge.

Plaintiffs Frank LaBruzzo, Bernard D'Arcangelo, Mary Rose LaBruzzo D'Arcangelo, the Clarissa M. Balfour Trust, and Orpheum Street, Inc. (collectively, the "Landowners") have brought suit against the United States (the "government") acting through the Army Corps of Engineers (the "Army") for taking their properties without compensation.  The Landowners claim to have each been owners of property in the 1800 block of Orpheum Avenue, Metairie Subdivision squares 129, 131, and 134, in Jefferson Parish, Louisiana.  In the aftermath of Hurricane Katrina in 2005, the Army entered the Landowners' properties with Louisiana's permission, modified the boundaries and shoreline of the properties with relation to Lake Pontchartrain, and constructed permanent structures upon it to improve the 17th Street Canal (the "Canal").  The canal is a key element of the flood control system for New Orleans.  The Landowners seek $2.2 million in compensation plus interests and costs.

The Landowners' primary claim arises under the Takings Clause of the Fifth Amendment.  Compl. ¶¶ 14, 17.  The complaint, filed March 22, 2018, alleges April 2013 as the date of the taking.  Compl. ¶¶ 8, 13, 16.  Alternatively, the Landowners assert a breach of contract claim, arguing that specified agreements between the Army and local government entities required the United States to compensate them for property taken in furtherance of the pertinent flood mitigation projects.  Compl. ¶ 16.

The government has moved to dismiss the complaint for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"). [Def.'s] Mot. to Dismiss ("Def.'s Mot."), ECF No. 19. The government's primary argument asserts that the six-year statute of limitations for claims against the government bars the Landowners' claim because any claim would have accrued by April 2011. *Id.* at 7-8. The government also asserts, in a footnote, that the Landowners fail to state a claim upon which relief can be granted because Louisiana, and not the Army, took their property. *Id.* at 8 n.3. The government's motion to dismiss provided four exhibits ("DX"): a 2008 Project Partnership Agreement ("Project Agreement") between the Coastal Protection and Restoration Authority of Louisiana (the "CPRA" or "Coastal Authority") and the Army, DX A, ECF No. 19-1; a March 2010 Amendment to the 2008 Project Agreement, DX B, ECF No. 19-2; a March 2009 letter from the CPRA authorizing certain levee districts to provide land to the Army for flood mitigation projects ("CPRA Authorization Letter"), DX C, ECF No. 19-3; and a letter from the East Jefferson Levee District (the "Jefferson District") that authorized the Army to enter upon specified lands and construct flood mitigation projects upon them ("Jefferson District Right of Entry Letter"), DX D, ECF No. 19-4.

The Landowners responded in opposition, arguing that a permanent taking could not have occurred until the Army evidenced an intent to remain permanently, which occurred in 2013, and not when Jefferson District granted the right of entry in 2011. [Pls.'] Mem. in Opp'n to Mot. to Dismiss ("Pls.' Resp."), at 3-4, ECF No. 24. The Landowners commented that the government's motion had not put ownership at issue, but requested an opportunity to supplement their response if the government raised that issue. *Id.* at 5.

The government's subsequent reply challenged whether the Landowners had a property interest after April 2011, arguing that any claim accrued not upon entry, but when the Army acquired the property interest from the Jefferson District. [Def.'s] Reply in Supp. of Mot. to Dismiss ("Def.'s Reply"), ECF No. 25. The Landowners then moved to supplement their response and to conduct discovery, both of which would address issues of ownership disputed by the government. *See* [Pls.'] Mot. for Leave to File First Suppl. Mem. in Opp'n to Mot. to Dismiss, & Incorporate[] Mot. to Conduct Disc. . . . ("Pls.' Mot."), ECF No. 26; [Pls.'] Mem. in Supp. of [Pls.' Mot.] ("Pls.' Mem."), ECF No. 27. Appended to the Landowner's motion to supplement were several exhibits ("PX"), including a February 2006 Commandeering Order regarding Canal repairs issued by the governor of Louisiana ("Commandeering Order"), PX 2, ECF No. 26-2, and a January 2006 Supplemental Agreement between the United States and several local government entities ("Supplemental Agreement 2") relating to rehabilitation of damaged areas of the Canal, PX 3, ECF No. 26-3. The government responded in opposition to discovery, arguing that the Landowners' exhibits pre-date 2011, and thus do not counter the government's argument that the claim accrued in 2011. [Def.'s] Resp. to [Pls.' Mot.] ("Def.'s Opp'n"), ECF No. 32.

The court held a hearing on the competing motions on July 18, 2019. During the hearing, the court requested that both parties provide state court decisions relevant to the scope of commandeering orders and state court decisions pertaining to earlier taking suits brought by the Landowners. Hr'g Tr. 37:12-24, 39:6 to 40:15, 41:1-17 (July 18, 2019). The Landowners and the government responded by providing: (1) state district court, state appellate court, and federal district court decisions in *Olivier Plantation, LLC v. Parish of St. Bernard*; (2) a state appellate

court decision in *Borgnemouth Realty Co. v. Parish of St. Bernard*; (3) the complaint, pleadings, trial court decision, appellate court decision in *La Bruzzo v. State ex rel. Governor* brought by plaintiff LaBruzzo in state court; (4) pleadings relating to LaBruzzo's attempt to intervene in a state district court case, *Sid-Mar's Restaurant & Lounge Inc. v. State Ex rel. Governor*; and (5) a federal district court decision in *Sid-Mar's* pertaining to the State's claim against the United States after a state court held the State liable for a taking. *See* Notices of July 30 and 31, 2019, and August 9, 2019, ECF Nos. 38, 39, & 40.[1]

Based on the pleadings and the documentary materials currently before it, the court concludes that it possesses jurisdiction to hear the Landowners' claim.  The Landowners have alleged sufficient facts that suggest their claim is timely, that they had a property interest on and after March 2012, and that the United States is responsible for taking that interest.  Accordingly, the government's motion to dismiss the complaint for lack of subject-matter jurisdiction and for failure to state a claim is denied.  The Landowners' motion to conduct discovery into jurisdiction is denied as moot.[2]

## BACKGROUND[3]

### A.  The Landowners' Properties

The Landowners each claim to have owned properties located at 1834, 1836, 1838, and 1840 Orpheum Avenue in squares 129, 131, and 134 in Metairie, Louisiana.  Compl. ¶ 10. Located in Jefferson Parish, Metairie abuts New Orleans on the east and Lake Pontchartrain (the "Lake") to the North.  *E.g.*, Jefferson Parish GeoPortal, http://geoportal.jeffparish.net/public (last visited Aug. 8, 2019) (Jefferson Parish's interactive property map).[4]  The Mississippi River (the "River") is nearby to the south.  *Id.*

Most of New Orleans and Jefferson Parish straddles the Lake and the River, much of the land lies at or below sea level, and nearly all of the land lies below River level.  Because of these circumstances, the New Orleans region contains numerous flood control structures, such as canals, levees, and pumping stations.  *See e.g.*, Richard Campanella, Ctr. for Bioenvt'l. Res. at Tulane & Xavier Univs., *Above-Sea-Level New Orleans: The Residential Capacity of Orleans Parish's Higher Ground*, at 2-3, 6 (2007).  One such structure is the 17th Street Canal, the largest

---

[1]The decisions in the identified cases or pleadings are subsequently cited as such, rather than being designated by exhibits.

[2]The court accepts the Landowners' supplemental memorandum in opposition to the government's motion to dismiss, as it responds to an argument first raised in detail by the government's reply brief in support of its motion to dismiss.

[3]This background does not constitute a finding of facts by the court, and it does not determine facts pertinent to subject-matter jurisdiction that are disputed by the parties.  Rather, the purpose is solely to provide context and to analyze the pending motions.

[4]This interactive map of Jefferson Parish shows roads, land parcels, the general contour of the land, and structures.  Structures and land parcels can be individually queried for address, zone type, square and lot number, and elevation.

and most important canal.  *See* J. David Rogers, et al., *Interaction between the US Army Corps of Eng'rs & the Orleans Levee Bd. preceding the drainage canal wall failures & catastrophic flooding of New Orleans in 2005*, 17 Water Policy 707, 712 (2015).  The top of the Canal lies in part above the adjacent land.  *Id.* at 715-16.

The Canal runs south to north, separating New Orleans from Metairie, and discharging into Lake Pontchartrain.  *See e.g.*, Jefferson Parish GeoPortal:



Orpheum Avenue runs adjacent to the Canal along its western bank, terminating almost at the north end of the Canal.  *Id.*  Homes and businesses exist on the west side of Orpheum Avenue. *See, e.g.*, *id.*  The northern-most road to bisect Orpheum Avenue is the Metairie Hammond Highway, which runs east and west and crosses the Canal.  *E.g.*, *id.*  The 1800 block of Orpheum Avenue is the first and only block north of the Metairie Hammond Highway.  *See id.*  Several hundred feet into the block begins a peninsula that prior to the Army's construction activity measured approximately 800 feet north to south and less than 300 feet at its widest point, bordered by the Canal to the east, the Lake to the north, and a small bay to the west.  *E.g.*, *id.* Neither party has identified on a plat or similar map the precise location of the properties or has described the former structures, but the Landowners' properties appear to lie mostly on this peninsula, *e.g.*, *id.*; Compl. ¶ 10 (property locations),[5] and in 2005 they appear to have contained small recreational structures, such as a boat house and several storage sheds, *see infra*, at 10 (depicting satellite imagery from July 11, 2005).  At the base of the peninsula and immediately south of the Landowners' addresses was, until destroyed by Hurricane Katrina, Sid-Mar's Restaurant and Lounge ("Sid-Mar's"), located at 1824 Orpheum Avenue.  *See* Jefferson Parish GeoPortal; *United States v. Sid-Mars Rest. & Lounge, Inc.*, 644 F.3d 270, 271-72 (5th Cir. 2011); *Sid-Mar's Rest. & Lounge, Inc. v. State ex rel. Governor*, 14-CA-52 (La. App. 5 Cir. 5/21/14); 142 So. 3d 188.[6]

---

[5]The complaint identifies three properties at 1834-36, 1838, and 1840 Orpheum Avenue in squares 129 and 134, and a fourth property in Square 131.  Compl. ¶ 10.  Based on an 1837 "Plan of Metairieville" as reconstructed in 1923 from a record filed in 1916 with Jefferson Parish, Square 129 lies at the northwest quadrant of Orpheum Avenue and the unconstructed Plane Street north of the Metairie Hammond Highway.  *See* Order of Dismissal, *Front St. Corp. v. Lagman*, No. 576-928 (La. 24 Judicial D. 5/27/2010), at *1.  Each square appears to be 319 feet north to south by 300 feet east to west. Pet. Ex. 3A, *La Bruzzo v. State ex rel. Governor*, No. 726-795 (La. 24 Judicial D.) (1837 "Plan of Metairieville").  The squares shown in the 1837 Plan match the location of squares described by the Jefferson Parish Geoportal, to include squares 129 and 134, except that squares 126, 127, 130, and 131 are not displayed.  *Compare id.*, *with* Jefferson Parish Geoportal.  Plane Street would have been one square north of what is now Metairie Hammond Highway. Pet. Ex. 3A, *La Bruzzo v. State ex rel. Governor*, No. 726-795. Square 134 is not shown on the Plan, but based on the square numbering pattern and the Jefferson Parish Geoportal, it lies directly above Square 129, which lies above Square 128.  *Id.*; *see also* Jefferson Parish Geoportal (showing square 134, but at 1858 Orpheum Avenue, instead of 1840 as listed in the complaint).  Correlating the squares to a 1996 land survey, *id.* Ex. 1, and satellite imagery from 2005, *see infra* at 10 & n.11, a portion of squares 129 and 134 and all of Square 131 appear to have been submerged within the adjacent Bucktown Harbor Marina by 2005.  It is not apparent whether or how much of the submerged portions of these squares were originally dry land.  The former location of a notable nearby property, Sid-Mar's Restaurant & Lounge at 1824 Orpheum Avenue, was within Square 128.  *See* Jefferson Parish Geoportal.

[6]In reported decisions, "Sid-Mar's" is sometimes shown with an apostrophe and sometimes not.

## B.  Hurricane Katrina & Rehabilitation Plans

On August 29, 2005, Hurricane Katrina struck New Orleans and destroyed structures along the 1800 block of Orpheum Avenue, including Sid-Mar's Restaurant.  More consequentially, a combination of a storm surge and potentially inadequate engineering caused several canals to fail, including the 17th Street Canal, during the early morning of August 29, 2005.  Rogers, et al., *supra*, at 716.  The Canal breach on the east wall caused significant flooding in New Orleans, and a resultant loss of life and property.  *Id.*

In October 2005, the Army and the Orleans Levee District entered into a cooperation agreement "for the rehabilitation of a portion of the [Hurricane/Shore Protection Project]" in the vicinity of Lake Pontchartrain.  PX 3 at 3 (Supplemental Agreement 2, discussing the original agreement).  This agreement was supplemented in January 2006 by Supplemental Agreement 2, which added Jefferson District, among other local governments, and noted that rehabilitation efforts required that "*interim* gated closure structures and integrated pumping capacity be constructed to allow for *permanent repairs* . . . [to the] 17th Street Outfall Canal." *Id*. at 1, 3 (emphasis added); *see also id.* § I.A.  Supplemental Agreement 2 contained a land acquisition section, amended later that year, that mandated Jefferson District "furnish" for each construction contract all property interests required by the Army "prior to the advertisement of that construction contract." *Id.* § III.A.4.  Property interests to be conveyed to the Army fell into three categories: public lands controlled by the local government entity sponsoring the work (*e.g.*, Jefferson District), public lands controlled by other government entities, and private lands. *Id*. § III.A.1-3.  The Jefferson District agreed to "commandeer [or cause the State to acquire] all lands, easements, and rights-of-way" necessary for the project and belonging to private parties, "as may be determined by the [Army] to be necessary" for the work, and then "tender to the [Army] a right of entry." *Id*. at 4, § III.A.3.a, c (discussing private acquisition).  The initial agreement also provided that the United States would "perform such relocations as it determines to be necessary . . . , identify and provide just compensation to the owners of compensable interests in the [privately owned lands]," and "inform  all affected persons of [their rights under] the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970," 42 U.S.C. § 4601-55 ("Uniform Relocation Act"), and related regulations of 49 C.F.R. Part 24, PX 3 § III.B.  The United States would "obtain a deed or servitude . . . in the name of [the Jefferson District]" for the commandeered property, and if it could not obtain "free and unencumbered title" or reach an agreement with the private owners, it would "obtain such interests, in the name of the United States of America, through the exercise of eminent domain." *Id*. § III.B.1-2.  Upon completion of the rehabilitation and repair work, the Army would convey all property back to the local government.  *Id*. § III.B.3.

To effect immediate repairs of the Canal, the governor of Louisiana issued a Commandeering Order on February 10, 2006, pursuant Supplemental Agreement 2 and the Louisiana Homeland Security & Emergency Assistance and Disaster Act ("Emergency Act"), as amended, La. Stat. Ann. R.S. §§ 29:721-739 (2003).  PX 2 at Preamble, § 3 (Exec. Order No. KBB 2006-6 (Feb. 10, 2006)).[7]   The Commandeering Order "commandeer[ed] the use of" 10.2

---

[7]The Emergency Act allows the governor, "[s]ubject to any applicable requirements for compensation, [to] commandeer or utilize any private property if . . . necessary to cope with the disaster or emergency."  La. Stat. Ann. R.S. § 29:724(D)(4) (2003).  Parish presidents have

acres of Jefferson Parish for "construction and repair" of the 17th Street Canal.  PX 2 §§ 1, 2. The work encompassed "levee and floodwall construction and repair, constructing an *interim* gated closure structure north of the Hammond Highway Bridge . . . [and] integrated pumps, . . ." and granted the "right to deposit fill . . . and waste materials . . ., to move, store, and remove equipment and supplies and erect and remove *temporary* structures . . . ." *Id*. § 2 (emphasis added).  The Commandeering Order "reserved however, to the landowners . . . all such rights and privileges in said land as may be used without interfering with or abridging the rights hereby acquired," subject to pre-existing easements.  *Id*. § 2.  The Commandeering Order required landowners to be identified and compensated pursuant to the terms of several agreements between the United States and local entities.  *Id*. § 3.  The Landowners' properties were encompassed within the 10.2 acres commandeered by Louisiana.  *See La Bruzzo v. State ex rel. Governor*, 14-262 (La. App. 5. Cir. 11/25/14); 165 So. 3d 166, 168.[8]  Sid-Mar's adjacent property was also commandeered by that Order.  *Sid-Mars*, 644 F.3d at 271-72.  As early as 2006, the Army blocked access to the entire peninsula to effect canal improvements.  *La Bruzzo*, 165 So. 3d at 168.

Subsequently, in December 2006, Supplemental Agreement 2 was amended.  Suppl. Agreement No. 2-A (Cooperation Agreement between the United States of America & . . . the East Jefferson Levee District [among others] for Rehabilitation of a Federal Hurricane/Shore Protection Project (Dec. 2006)).  Article III, regarding land acquisition, was supplemented in full.  *See id.* Art. VII (amending Art. III).  The Army would still determine the property interests necessary to complete the rehabilitation and repair work, *id.* Art. VII (new Art. III.A), and the Jefferson District was still required to authorize entry onto its lands and to obtain the necessary property rights over other public lands, *id.* Art. VII (new Art. III.B).  Before the Army would issue a solicitation for a construction contract, the Jefferson District would also "secure or cause to be secured, an executive commandeering order in accordance with [State law]" to acquire necessary private property, and provide the Army with a right of entry allowing the construction work.  *Id.* Art. VII (new Art. III.C).  Further, if the local governments "cannot terminate or subordinate . . . third party private interest on lands, easements, and rights-of-way that are owned, claimed or controlled by [the Jefferson District] after having exhausted all available remedies . . . excluding expropriation, the [United States] shall acquire such interest."  *Id.* Art. VII (new Art. III.D).  The acquisition of property rights would still be governed by the Uniform Relocation Act and attendant regulations.  *Id.* Art. VII (new Art. III.F).

On September 22, 2008, the Army and the Coastal Authority signed the Project Agreement to delineate terms and responsibilities for new work to improve the original flood control project in the vicinity of Lake Pontchartrain.  *See generally* DX A.  The new work added to the original project was identified as the "modified project" and would consist of "armoring of critical elements and reinforcing or relocating floodwalls as necessary to improve performance of the [original project], and [] other measures, as necessary."  *Id.* § 1.D.  The Army would "design and construct" most of the work, including both the work to be fully-funded by the federal

---

identical authority.  La. Stat. Ann. R.S. § 29:727(F)(4) (2003).  The Emergency Act has been amended subsequent to the issuance of the Commandeering Order, but the differences are immaterial.

[8]In reported decisions "LaBruzzo" is sometimes shown as "La Bruzzo."

government and that to be funded by the Coastal Authority. *Id*. § II.A.  The Project Agreement recognized that access to or acquisition of private lands might be necessary.  DX A Art. III.  Accordingly, it required the United States to identify for the CPRA "the lands, easements, and rights-of-way required for construction, operation, and maintenance of the [improvements to the original flood control project], including those required for *relocations*, [and] the borrowing [or disposal] of material." *Id*. § III.A (emphasis in the original, denoting that the term was specifically defined).  The CPRA was required to obtain "all lands, easements, and rights-of-way the [United States] determines [as necessary] for that work." *Id*. § III.A.1.  The Project Agreement required "[a]quisition of all lands, easements, and rights-of-way . . . in accordance with the . . . [Uniform Relocation Act]" and related regulations. *Id*. § III.D.  The agreement also included a clause that disclaimed the creation of any rights or conferral of any benefits in any non-party. *Id*. Art. XIX.

On March 18, 2009, the CPRA authorized the Jefferson District to "fulfill the [CPRA's] obligations under [Project Agreement Article III regarding land acquisition] to provide Rights of Entry required therein, and . . . to provide . . . Rights of Entry to the immovable property interests owner or to be obtained or acquired and provided by [the Jefferson District] to the [Army] to support the access and construction and the operation, maintenance, repair, rehabilitation, and replacement [of the flood control projects]."  DX C at 1.  The authorization "applie[d] . . . to the extent that rights of entry to such immovable property interests have been requested in writing by the [Army] for the [specified work]." *Id*.

The Project Agreement was amended for the first time on March 12, 2010.  DX B at 1.  The basis was, in part, "to address the modifications of the 17th Street [Canal]." *Id*.  The changes included modification of the Project Agreement's definition of "new work" to encompass recently authorized work to modify the Canal and to install a permanent pump station where the Canal discharges into Lake Pontchartrain. *Id*. §§ 1, 5, 6.

In a series of three letters in 2010 and last revised on November 23, 2010,[9] the Army identified certain properties necessary for the permanent pump station.  *See* DX D at 1; *id*. Ex. A at 1-2.  The Army requested "rights of entry [] for construction" purposes. *Id*. Ex. A at 1 (capitalization removed).  Accordingly, in April 2011, the Jefferson District provided the Army with rights of entry pursuant to the Project Agreement as delegated by the CPRA in March 2009. *Id*. at 1.  Jefferson District represented that it "has acquired [] immovable property interests or right of use thereof required by the [Army] as requested via [the three letters]," and that it was "vested with sufficient ownership interests in these immovable property interests or rights of use thereof to support the Right of Entry granted herein for the access and construction and the operation, maintenance, repair, rehabilitation, and replacement of the [pump station]."  DX D at 1.  It granted the Army the right to enter that property for those purposes. *Id*.  The Landowners' properties are among those covered, over which Jefferson District represented that an unnamed

---

[9]The Jefferson District's Right of Entry Letter states that the Army's letter was dated November 23, 2011.  The Army's letter, appended to the Jefferson District's letter, shows the date as November 23, 2010, and the Jefferson District's letter was issued in April 2011. *See* DX D at 1; DX D Ex. A at 1.

non-federal government entity was the owner. *Id*. Ex. D at 1-2.[10] There is no indication of what property rights, if any, belonged to private parties, what rights the Jefferson District actually possessed, or how it acquired those rights. The Jefferson District granted the Army a permanent right-of-way over the segment that encompasses the Landowners' properties, *id*. Ex. B at 1, although elsewhere it specified that the "right of entry is irrevocable and valid until completion of construction," *id*. at 2.

### C. The Army's Entry and Subsequent Construction Work

The Army entered, used, or otherwise blocked access to the Landowners' and Sid-Mar's' properties beginning in February 2006, from which time the Army has prevented the Landowners from exercising any ownership rights. *La Bruzzo*, 165 So. 3d at 168. Until at least March 2010, the Army's work appears to have been limited to restoring and strengthening the original project, *i.e.*, the Canal as it existed prior to Hurricane Katrina. *See* DX B at Preamble, § 1 (amending the Project Agreement to include "installation of pumps and closure structures at or near the lakefront"). The Army was not granted a right of entry for construction of the permanent pump station and closure structures until April 2011, DX D, and the Landowners argue that the contract for this work was not awarded until April 2013, Compl. ¶ 13, Attach. 1 at 1.

Sid Mar's Restaurant lay "adjacent to the [] Canal and just outside of the [levee system]." *Sid-Mars*, 644 F.3d at 271. After nearly 40 years of business, Hurricane Katrina destroyed the restaurant. *Id.* Sid-Mar's had plans to rebuild but those plans were thwarted by the Commandeering Order and subsequent work agreements. *Id.* at 271-72. The "federal government first entered the commandeered property in March 2006 to begin the construction project [and] has occupied the property since this time," *id.* at 272, 279, and "would later acquire full ownership rights in the property" pursuant to Supplemental Agreement 2, *id.* at 279. It appears that by 2009, much of what appears to be Square 128 at the base of the peninsula was occupied by apparently permanent (at least long-term) improvements, to include a road, several structures, and the interim pump station. This work appears to lay atop of at least a portion of Sid-Mar's former location. Removal of several of these structures appears to have started in 2019.

The remainder of the 1800 block north of Sid-Mar's seems to have been unaffected until at least early 2013, despite being within the scope of the Commandeering Order and inaccessible to the Landowners since 2006. The basic form of the Canal and the land also appears to have remained unchanged until early 2013. By the end of 2014, however, significant changes appeared on the peninsula, which substantially altered its form. At present, the Canal's width had been more than doubled to form a small basin at, or beginning immediately north of, where the Landowners' former properties were located. The small structures remaining after Hurricane Katrina are gone, and the Landowners' properties appear to be partially subsumed by flood

---

[10]Exhibit D within DX D contains a survey map that shows parcels and their owners. The parcel number applicable to the Landowners' properties appears to be 1-25, which is shown as owned by Louisiana. DX D Ex. D at 1-2; *see also id*. Ex. C at 4-5. Due to the poor image quality, however, the court cannot be certain of the number of the parcel upon which the Landowners' properties lie, but all parcels show a state or local government entity as the owner. *Id*. Ex. D at 1-2.

control barriers.  They may partially be underwater, and are now fully within the permanent flood control project.[11]



*Figure 1: Satellite Imagery from July 11, 2005.  The square building at center left is a U.S. Coast Guard Small Boat Station. Sid-Mar's is the structure to the east in the center of the photo.  The Landowners' properties lie to the north of Sid-Mar's.*

---

[11]Phases of construction and changes to the land were taken from time-lapse satellite imagery available from Google Earth showing the following dates:  July 11, 2005 (pre-Hurricane Katrina); September 1, 2005 (immediately post-Hurricane Katrina); March 30, 2006; May 30, 2006; August 24, 2009; March 22, 2010; November 29, 2011; October 5, 2012; March 5, 2013; October 31, 2014; August 25, 2015; April 6, 2016; May 13, 2017; October 16, 2017; January 24, 2018, January 25, 2019; and July 7, 2019.  The government provided corresponding imagery at the hearing held on July 18, 2019, which images were dated July 11, 2005; August 20, 2005, November 29, 2011; and January 24, 2018.



*Figure 2: Satellite Imagery of Figure 1 advanced to March 5, 2013.  The interim pump station and closure structure appear at the center of the image.  The rectangular structure at the northwest quadrant of the intersection west of the pumps is a restaurant, not associated with the project.*



*Figure 3: Satellite Imagery of Figure 1 advanced to January 24, 2018.  A new closure structure, basin, and levee walls appear. Imagery from 2019 appears to show that removal of the interim pump station and related structures has commenced.*

### D.  Previous Claims Involving the Commandeered Land

Sid-Mar's sued Louisiana in state court in June 2006 seeking just compensation.  *Sid-Mars*, 644 F.3d at 271.  In June 2009, while the state court suit remained pending, the United States filed a condemnation suit regarding a quarter-acre of property over which Sid-Mar's claimed an interest.  *Id.* at 272.  In federal district court, the United States sought successfully a stay of the state court suit.  *Id.*  On appeal, the Fifth Circuit found that while "the precise interest gained either by Louisiana or the United States by the act of commandeering is unclear, [] what is beyond question is that Louisiana acted in concert with the United States in taking control of this property."  *Id.* at 276.  The court opined that while Sid-Mar's relied on "the premise that in 2009, title was in the State of Louisiana," but that "premise may, however, be false," because the terms of the commandeering order provided a "right of entry" and "specifically reserved to the private owners 'all such rights and privileges . . . as may be used without interfering with or abridging the rights [] acquired' by the commandeering."  *Id.* at 278 (quoting the Commandeering Order).  The court was unsure what Louisiana acquired through the Commandeering Order.  If "Sid-Mar's or other owners still had title because title was among 'such rights and privileges [reserved],' then the condemnation is necessary to establish that title."  *Id.* at 279.

In 2012, the federal district court lifted the stay to allow the state court to determine title.  *See* Order & Reasons, *United States v. 0.166 Acres of Land*, No. 09-3714 (E.D. La. Dec. 20, 2012), ECF No. 128.  Subsequently, in 2013, a Louisiana court found that the Commandeering Order "effected a 'taking' of plaintiffs' property by the State of Louisiana."  *Sid-Mar's Rest. & Lounge, Inc. v. State ex rel. Governor* (La. App. 5 Cir. 5/21/14); 142 So. 3d 188, 192, 196, *aff'g*, No. 632-032 (La. 24 Judicial D. 3/21/13) (finding that "the hurricane protection improvements . . . are permanent and caused Sid-Mar's to lose all ownership rights").  The court also found that Sid-Mar's property "was not a former lake bed," and thus was neither owned nor otherwise acquired by the state.  *Id.* at 194, 200, 201.  The court found that Sid-Mar's owned or had "an 'economic right' in [the commandeered property] . . . that was interfered with by the State's [Commandeering Order]."  *Id.* at 202.  Louisiana argued against liability in part by averring that the Commandeering Order "only intended to *temporarily* commandeer the use of the property for the federal government pending condemnation by the federal government."  *Sid-Mar's*, No. 632-032, at *3 (emphasis added).  The trial court rejected that argument, noting that the effect of the order was placement of permanent structures and permanent denial of access.  *Id.* at *3-4.  Sid-Mar's was awarded over $2 million in economic damages and $850,000 in fees and costs against the State.  *Sid-Mar's Rest. & Lounge, Inc. v. State ex rel. Governor*, 182 So. 3d 390, 392, 405-06 (La. App. 5 Cir. 12/5/15).  In 2016, Louisiana successfully moved in the district court to acquire most of the money deposited with the court by the United States when it initiated the condemnation action.  *See* Order & Reasons at *11-12, *United States v. 0.166 Acres of Land*, No. 09-3714 (E.D. La. Dec. 20, 2012), ECF No. 167.

Plaintiff LaBruzzo attempted unsuccessfully in 2008 to intervene in Sid-Mar's' state suit and in another similar state suit brought by Plaintiff Balfore Trust.  *La Bruzzo*, 165 So. 3d at 174.  In May 2013, LaBruzzo sued Louisiana under state law for taking his property through the 2006 Commandeering Order.  *Id.* at 168.  The court rejected his claim as time-barred by the three-year statute of limitations applicable to the State's taking of private property, which began to run upon the Army's visible entry in February 2006.  *Id.* at 170-71.  The court also held that a

commandeering is "a particular kind of statutory taking" where "the State acquires particular rights in or title to the land . . . by virtue of its compliance with the particular statutory scheme cited [by the order]," and that whether it is temporary or permanent is "relevant to the calculation of damages," but not to "determine the point in time in which a landowner is put on notice that the State has interfered with his rights of ownership." *Id.* at 172, 176. LaBruzzo also argued that the taking did not occur until 2013 when the state court issued its decision in *Sid-Mar's* regarding the effect of a Commandeering Order. *Id.* at 171-72. In rejecting this argument, the court found that "the rulings in *Sid-Mar's* case are not relevant . . . because the two suits involve different parcels of immovable property and issues that are specific and exclusive to each," and therefore "a ruling on the merits of *Sid-Mar's* particular claims is not definitive with respect to [LaBruzzo's] legal rights regarding a different parcel." *Id.* But because the trial court found LaBruzzo's case time-barred, it "made no ruling regarding title to the property." *Id.* at 176.

The Landowners submitted an administrative claim for compensation to the Army in November 2016. The Landowners argued that in April 2013, the Army awarded a contract for a permanent pump station at the terminus of the Canal, "a representative date upon which the real property . . . was formally and permanently acquired." Compl. Attach. 1 at 1-2. The claim also mentions April 2011, when "certain documents were executed authorizing the [Army] to enter the property for Permanent Pump Station construction," as "[a]lternatively the earliest date that the [Landowners'] property could be determined to have been 'taken.'" Compl. Attach. 1 at 2. The claim also argued the Landowners were third-party beneficiaries, Compl. Attach. 1 at 2, presumably to the Commandeering Order or the various project agreements.

The Landowners state that they have not received any compensation, either from Louisiana or the federal government. *E.g.*, Pls.' Resp. at 1; *see also La Bruzzo*, 165 So. 3d at 169 ("nor had [LaBruzzo] ever been contacted by the State"). At this juncture, the Landowners' administrative claim to the Army may, or may not, still be pending.

## STANDARDS FOR DECISION

### A.  *Rule 12(b)(1) - Lack of Subject-Matter Jurisdiction*

The Tucker Act provides this court with jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). A claim in this court is, however, "barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. This six-year statute of limitations is jurisdictional and is not susceptible to equitable tolling or any of the other doctrines that would excuse an untimely claim. *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134-38 (2008).

The Landowners, as plaintiffs, must establish jurisdiction by a preponderance of the evidence. *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)). When ruling on the government's motion to dismiss for lack of jurisdiction, the court must "accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Id.* at 1163 (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)). When the parties dispute alleged facts bearing upon jurisdiction, the court "may weigh

relevant evidence." *Mildenberger v. United States*, 643 F.3d 938, 944 (Fed. Cir. 2011) (quoting *Ferreiro v. United States*, 350 F.3d 1318, 1324 (Fed. Cir. 2003)). "If a court lacks jurisdiction to decide the merits of a case, dismissal is required as a matter of law." *Gray v. United States*, 69 Fed. Cl. 95, 98 (2005) (citing *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868); *Thoen v. United States*, 765 F.2d 1110, 1116 (Fed. Cir. 1985)); *see also* RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss.").

### B. *Rule 12(b)(6) - Failure to State a Claim upon which Relief can be Granted*

A complaint will survive a motion to dismiss under RCFC 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The factual matters alleged "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555-56 (citations omitted).

When reviewing the complaint, "the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009) (citing *Papasan v. Allain*, 478 U.S. 265, 283 (1986) (additional citation omitted)). Conclusory statements of law and fact, however, "are not entitled to the assumption of truth" and "must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. "'[N]aked assertions[s]' devoid of 'further factual enhancement'" are insufficient to state a claim. *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557); *Accord Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.").

## ANALYSIS

### A. *Subject-Matter Jurisdiction and the Six-Year Statute of Limitations*

On its face, the Landowners' complaint satisfies the six-year statute of limitations. The complaint posits April 2013 as the date of the taking, when the United States, by awarding the contract for the permanent closure structure and pump station, took the property or breached a contractual obligation to provide just compensation. Compl. ¶¶ 8, 13, 16. A claim that accrued after March 2012 would be timely.

The government, however, argues that sufficient evidence exists to undermine the Landowners' facially-compliant allegation. Relying on the Jefferson District Right of Entry Letter, the government contends the claim accrued no later than April 8, 2011, "the date when the [Jefferson] Levee District granted the [Army] a right-of-entry for construction of the 17th Street Permanent Pump Station," and that the "[Jefferson] Levee District necessarily acquired [its] property interest . . . prior to April 8, 2011." Def.'s Mot. at 7. The government further suggests, without explanation, that the Landowners "were aware or should have been aware" that the Jefferson District took their properties prior to March 2012, which would bar their claim as untimely per the six-year statute of limitations. *Id.* at 7-8.

The Landowners respond by positing, in effect, that two distinct takings occurred. First, some transitory property interest was taken for the interim work by the Army, which was completed by 2009. Pls.' Resp. at 2. Then in 2009, the government began plans for new work, the permanent pump station, but this new work "did not begin in earnest until the award of the contract for construction in April 2013." *Id*. Initiation of this work in 2013, argue the Landowners, constitutes the onset of the physical occupation necessary to affect a permanent taking, and not the date of preceding agreements to which they were not a party. *Id*. at 4 (citing, in part, *National Food & Beverage Co. v. United States*, 105 Fed. Cl. 679, 694-96 (2012) ("*National Food II*")). The Landowners' claim relates to this second taking, which allegedly took the property interests that remained after the first taking.

When the Landowners' claim accrued represents the primary issue. A physical taking begins when the government "interferes with or substantially disturbs the owner's use and enjoyment of the property," which may occur at a date later than when access to the property was permitted. *National Food II*, 105 Fed. Cl. at 695-96 (quoting *Alder v. United States*, 785 F.2d 1004, 1008 (Fed. Cir. 1986) (other citations omitted)). Under the "accrual suspension rule," the six-year limitations period may be suspended if the Landowners can show that they were unaware of the taking because either the government has "concealed its acts" or the "injury was 'inherently unknowable' at the time the cause of action accrued." *Ingrum v. United States*, 560 F.3d 1311, 1314-15 (Fed. Cir. 2009) (citations omitted); *accord Ladd v. United States*, 713 F.3d 648, 652-53 (Fed. Cir. 2013). "Open and notorious" governmental actions place a plaintiff "'on inquiry as to its possible injury,' and the statute of limitations begins to run." *Ingrum*, 560 F.3d at 1315 (quoting *Coastal Petroleum Co. v. United States*, 228 Ct. Cl. 864, 867 (1981)).

The Commandeering Order effected the first taking in 2006, well outside the six-year the statute of limitations period. Entry followed immediately thereafter and would have been readily apparent. It appears, however, that this taking was limited in both scope and duration, *i.e.*, it was a temporary physical taking of the use of, and access to, the properties at issue to address the emergency circumstance that arose due to Hurricane Katrina. *See Caquelin v. United States*, 140 Fed. Cl. 564, 573-78 (2018) (discussing the different types of takings). The Commandeering Order, by its express terms, reserved rights to the Landowners and appeared limited in duration and to work involving Canal repairs. PX 2. The Fifth Circuit in *Sid-Mars* made similar observations about the effect of the Commandeering Order, doubting whether title had passed as a consequence of that Order. *Sid-Mars*, 644 F.3d at 278-79.

Louisiana state court decisions indicate that commandeering orders provide the State with limited property rights restricted to the duration of a declared emergency. A Louisiana state court had occasion to discuss the effect of a commandeering order in another Hurricane Katrina-related case, *Olivier Plantation, L.L.C. v. Parish of St. Bernard*, No. 109-272 (La. 24 Judicial D. 3/12/12), at *13 ("*Olivier Plantation II*") (noting that commandeering due to a natural disaster occurred after Hurricane Katrina), *aff'd*, 151 So. 3d 965 ("*Olivier Plantation III*") (La. App. 4 Cir. 10/30/14). In *Olivier Plantation II*, to effect levee repairs, St. Bernard Parish commandeered private property for the extraction of clay at the federal government's request. *Id.* at *1-2. The court first noted that the "concept of an acquisition of interest in property by 'commandeering' is foreign to Louisiana's civilian law." *Id.* at *11. Regarding the legal effect, "commandeering immovable property is not a right in or to title to the land, nor is the owner divested of title by the commandeering order, although his right of use is suspended during the

duration of the emergency declaration," and the order expires with the emergency declaration. *Id.* at \*13-14.  Instead, the right created is "a temporary easement, indicating a right to enter and/or occupy or right of way and passage," and "would grant no further right than mere entry, passage and occupancy," but not the right, for example, to extract clay. *Id.* at \*14-15.  This court has previously accepted *Olivier Plantation II*'s interpretation in a similar case involving an extraction of clay by the Army pursuant to a commandeering order issued by Plaquemines Parish in the aftermath of Hurricane Katrina.  *National Food II*, 105 Fed. Cl. at 695-96.  In a second state case involving a commandeering order for clay extraction issued by St. Bernard Parish, a Louisiana appellate court noted that the order "did not take full ownership of the commandeered land but reserved to landowners" some rights, *Borgnemouth Realty Co. v. Parish of St. Bernard*, No. 2013-CA-1651 (La. App. 4 Cir. 5/21/14); 141 So. 3d 891, 897, and the court found "[n]othing in the letters from the [Army] or in the resolutions of the Levee Districts [that] suggests an intent to appropriate greater rights than the rights obtained under the codal law of servitudes." *Id.* at 899.  Further, any "[d]oubt as to the existence, extent, or manner of exercise" of a servitude "shall be resolved in favor of the servient estate."  *Id.* (alteration in original) (citation omitted).  Thus, the commandeering order granted only limited rights, namely "a right of way for entry [for making repairs] as well as temporary spoil easements." *Id.*

That the Landowners in this case do not now retain any property seems beyond dispute. But the government has not shown, nor even argued, that the Commandeering Order took all of the Landowners' property rights.  Therefore, if the Commandeering Order took limited rights, and for a limited time, as apparently it did, then a second, subsequent taking must have occurred to divest the Landowners of their remaining rights.

The clay-removal cases support the sequential takings theory.  The second taking would "accrue[] . . . 'when it becomes clear that the gradual process set into motion by the government has effected a permanent taking.'"  *Andrews v. United States*, 108 Fed. Cl. 150, 157 (2012) (quoting *Boling v. United States*, 220 F.3d 1365, 1370-71 (Fed. Cir. 2000)); *see also National Food & Beverage Co. v. United States,* 96 Fed. Cl. 258, 264-65 (2010) ("*National Food I*").  In *National Food I*, this court held that the pertinent commandeering order "effected a temporary taking of the *access* to the clay deposits, but the [Army's] physical removal of the clay effected a permanent taking of the excavated material itself."  96 Fed. Cl. at 264 (emphasis added).  The state trial court in *Olivier Plantation II* endorsed these conclusions.  *Olivier Plantation II*, at \*16-18.  In other contexts, this court has recognized the accrual of a second taking when the government expands the scope of its original taking.  *E.g.*, *Andrews*, 108 Fed. Cl. at 157 (discussing how an increase of flights or introduction of louder aircraft may increase the scope of a pre-existing overflight easement, and thus effect a second taking) (citations omitted).

The government argues that the permanent and total taking occurred no later than April 2011, when the Jefferson District transferred its property interests to the United States and represented that the pertinent lands were not privately held.  *E.g.*, Def.'s Reply at 1-2.  The government, however, has not shown that the Jefferson District had all of the property interests taken by the Army.  Several reasons support this conclusion.  First, the Jefferson District Right of Entry Letter arguably granted only a right of entry and temporary use, and not total or permanent possession.  *Cf. National Food II*, 105 Fed. Cl. at 695-96; *Borgnemouth Realty*, 141 So. 3d at 897; *Olivier Plantation II*, at \*14-15.  Second, Jefferson District could only convey what it possessed.  If Jefferson District's property interest originated from the Commandeering

Order issued on February 10, 2006, which emergency arguably ended in 2009 with the completion of temporary repairs and pumping stations, it would suggest that by April 2011, the Jefferson District had no further rights, leaving significant property interests with the Landowners.  Therefore, some later act would be necessary to extinguish the Landowners' property interests.  Third, the government has presented no evidence that the Landowners knew or should have known of the April 2011 transfer that the government posits as the date of claim accrual.

Here, the Army was already on the property, apparently pursuant to the Commandeering Order.  Thus, the second claim would accrue when the Landowners knew or should have known that Army intended to interfere with their *remaining* property interests, which would occur when the government either gave constructive notice by openly and notoriously exceeding its prior right of entry and temporary use or gave actual notice of its intent to expand the scope of the taking.  The government has made no showing that the Landowners knew before March 2012 of any action that would extinguish their remaining rights.  *Cf. Ladd*, 713 F.3d at 653 (finding, in a rails-to-trails taking case, that the government's issuance in 1998 of a notice of interim trail use that would change the scope of railroad's right-of-way "was inherently unknowable" because it was not published in the *Federal Register* or a newspaper and there was no evidence of actual knowledge, and thus did not cause the claim to accrue).  While the Army had temporarily used the properties for a time beginning in 2006, the government has not shown that the Army intended or acted to permanently take the properties.  The Landowners' allegations, supported by some evidence, suggests otherwise.  *See supra*, at 10-11 & n.11.  Unlike for Sid-Mar's Restaurant, permanent structures and alterations do not appear to have been built and made on the Landowners' properties until at least 2013.  Continuing to exercise a right of entry and temporary use until April 2013 would not put the Landowners on notice that two years earlier the government had changed the character of the taking, from temporary to permanent, from limited to total, from a temporary servitude to fee simple.  Accordingly, the Landowners' suggested date of April 2013 remains plausible.

**B.  *Subject-Matter Jurisdiction Over the Nature of the Army's Entry***

The government also contends that if the Landowners retained property interests at the time the United States took full and permanent control, then the United States' entry constitutes a trespass and not a taking.  *E.g.*, Def.'s Opp'n at 2-3; Hr'g Tr. 14:1.  Because this court lacks jurisdiction to hear tort claims, this characterization of events would deprive the court of jurisdiction.

The distinction between a trespass and a taking "requires consideration of whether the effects [] experienced were the predictable result of the government's actions, and whether the government's actions were sufficiently substantial to justify a takings remedy."  *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003).  The government must either "intend[] to invade a protected property interest or the asserted invasion [must be] the 'direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.'"  *Id.* (quoting *Columbia Basin Orchard v. United States*, 132 F. Supp. 707, 709 (Ct. Cl. 1955)).  The Landowners also "must show that [they] possessed a protectable property interest in what [they] allege the government has taken."  *Id.*

The Army's occupation of the Landowners' properties falls squarely within these parameters. The Army did not incidentally or sporadically enter and use the properties. Rather, the Army blocked off the properties, altered the landform, and erected permanent structures on portions while submerging other portions. Total deprivation of all property interests is a predictable result of such actions. The effect cannot be more substantial. And while the government claims it harbored no intent to take any private property rights, *see* Def.'s Opp'n at 5, the government confuses the requisite intent. The basis of inverse condemnation is that the government takes private property absent intent to do so. *See Kirby Forest Indus. v. United States*, 467 U.S. 1, 5 (1984) ("In addition to [] three statutory methods, the United States is capable of acquiring privately owned land summarily, by physically entering into possession and ousting the owner."); *Arkansas Game & Fish Comm'n v. United States*, 87 Fed. Cl. 594 (2009) (finding a taking where the Army was unaware that its periodic adjustment to river levels sometimes flooded a state forest, but where the recurrent flooding was nonetheless foreseeable), *rev'd*, 637 F.3d 1366 (Fed. Cir. 2011), *rev'd and remanded*, 568 U.S. 23 (2012), *aff'd on remand*, 736 F.3d 1364 (Fed. Cir. 2013). What matters is not whether the Army intended to violate a private property right.[12] Rather, the requisite intent is whether the Army intended its physical occupation. *See, e.g.*, *Arkansas Game & Fish*, 87 Fed. Cl. at 621 (discussing the requisite intent as "to invade and injure the property").[13] In this case, it did. The Army's physical occupation was also a foreseeable result of its work; the existing project encompasses the Landowners' properties.

Relatedly, the government argues that if the Jefferson District erred when it represented it had sufficient property interests, then the Army's entry was without authority, and thus was a trespass. Def.'s Resp. at 5; *see also* Hr'g Tr. 14:1. The "authorized activity" language applies when evaluating foreseeability, *i.e.*, when no direct intent exists, *e.g.*, *Ridge Line*, 346 F.3d at 1355, but as discussed, the Army intended its occupation. Further, the government errs in its interpretation of "authorized activity." In every successful inverse condemnation suit, the government lacks the authority, *i.e.*, permission, to enter the property. If the government had permission, no cause of action would exist. But "authorized" refers not to the entry, but to the activity. *Id.*; *see also Langenegger v. United States*, 756 F.2d 1565, 1572 (Fed. Cir. 1985) (citing *Blanchette v. Connecticut Gen. Ins. Corps.*, 419 U.S. 102, 127 (1974)) ("acts . . . [must] be authorized"). The occupation of the Landowners' properties was neither accidental, inadvertent, nor the work of rogue personnel. The Army sanctioned the work. The work occurred pursuant

---

[12]Whether for a taking or a tort, the operative intent applies to the entry, and not the mindset about the permissibility of entry. For example, civil trespass in Louisiana requires not an intent to violate a property interest, but rather an intent to be present on property without lawful authority or excuse. *E.g.*, *Terre Aux Boeufs Land Co. v. J.R. Gray Barge Co.*, 803 So. 2d 86, 96 (La. App. 4 Cir. 11/14/01) ("[A] defendant may be held liable for an *inadvertent* trespass resulting from an *intentional* act.") (emphasis in original).

[13]*Ridge Line* identifies and aligns two avenues to address an invasion of property by the government. The alternative to showing direct intent to invade is showing foreseeability, that the "direct, natural, or probable result," of the government's activity caused the invasion of private property. *Ridge Line*, 346 F.3d at 1355. Under either formulation, the focus is on the nature of the government's entry, not the government's mindset about the permissibility of its entry.

to agreements with the State, several federal statutes, and congressional appropriations.  *See, e.g.*, DX B (describing the scope of and authority for the permanent pump station).

The Landowners have adequately alleged that they possessed compensable interests at the time the United States took possession.  There is no evidence before the court that either the Army or Jefferson District had permanently acquired the Landowner's property before 2013, or indeed at any time, except on and after 2013 by invasion and exaction.  The Commandeering Order issued in February 2006 appears to only have divested the Landowners of limited rights for a limited duration, but did not transfer title.  No subsequent condemnation has been identified.  The Army's consequent work in and after 2013 permanently deprived them of all interests.  Regardless of what the Army thought it acquired, what Jefferson District thought it possessed, or what Jefferson District intended to convey, a second taking occurred.  The interests that remained after the first taking, which were effectively taken by the Army's construction, are likely compensable, just as were Sid-Mar's'.  As the Supreme Court has stated, the government has a "'categorical duty'" under the Fifth Amendment to pay just compensation when it "'physically takes possession of an interest in property.'"  *Arkansas Game & Fish Comm'n,* 568 U.S. at 31 (quoting *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002), and citing *United States v. Pewee Coal Co.*, 341 U.S. 114, 115 (1951)).

## C. *Stating a Claim upon which the Court can Grant Relief*

Finally, the government argues that Louisiana, not the United States, took the Landowners' properties.  Def.'s Mot. at 8 n.3*; see also* Def.'s Reply at 1-4.  Accordingly, the government contends that the Landowners fail to state a claim against the United States because the Landowners no longer had any interest in the properties when Jefferson District ostensibly transferred property interests to the United States.  Def.'s Reply at 3; Def.'s Opp'n at 5.  The government's argument raises two interrelated issues.  The first is whether the Landowners possessed a compensable interest when the Army came into possession, which as discussed in the tort-taking discussion, has been adequately alleged.  The second is whether a taking claim can exist against the United States when the State affected the original taking.

"There is nothing to suggest . . . that whenever the final act of expropriation is by the hand of a foreign sovereign, the United States cannot be held responsible."  *Langenegger,* 756 F.2d at 1571 (emphasis removed); *accord Erosion Victims of Lake Superior Regulation v. United States*, 833 F.2d 297, 299 (Fed. Cir. 1987).  "When considering a possible taking, *the focus is not on the acts of others, but on whether sufficient direct and substantial United States involvement exists*."  *Langenegger*, 756 F.2d at 1571 (emphasis in original); *accord Erosion Victims of Lake Superior*, 833 F.2d at 299; *Global Freight Sys. Co. v. United States*, 130 Fed. Cl. 780, 788 (2017).  The court examines "the nature of the United States involvement and [] the benefit secured."  *Langenegger*, 756 F.2d at 1571; *accord Global Freight Sys.*, 130 Fed. Cl. at 788.

In addition to *National Food I*, prior cases have found that a taking claim could be maintained against the United States—even when a foreign sovereign expropriated property—if the United States exhibited sufficient involvement.  In *Langenegger*, the court held that El Salvador's land reforms that expropriated property held by U.S. citizens "d[id] not preclude" a taking claim when the reforms were allegedly a condition for United States financial aid and drafted by the United States, though the court rejected the claim for other reasons.  756 F.2d at

19

1567, 1571.  Two years later, in *Erosion Victims of Lake Superior*, the court found that a taking claim against the United States was permissible for actions of an international commission, although plaintiffs failed to show that the United States derived benefit or appreciably influenced the commission's operations.  833 F.2d at 299.  In 2017, in *Global Freight Systems*, the court denied a motion to dismiss for failure to state a claim when Djibouti seized the vehicles of a U.S. government contractor who moved their vehicles off a U.S. military base and into Djibouti's jurisdiction per the Navy's direction.  130 Fed. Cl. at 782, 786, 788.

The Landowners have stated a claim against the United States even if Louisiana or Jefferson District were the entities who ostensibly took the property.  Similar to *National Food I*, the government's argument is "sophistic and wholly lacking in substance," and "wholly ignores the reality of what happened."  *National Food I*, 96 Fed. Cl. at 264.  In this case, Jefferson District said it conveyed the property to the Army because the Army identified the properties as necessary for the Canal project.  The District's representations about its ownership may have been false, depending on whether it had previously acquired the property and what it acquired.  While the original taking lies outside this court's jurisdiction, the second taking, to construct the permanent pump station, occurred pursuant to agreements that obliged Jefferson District to acquire properties identified by the Army and then to convey those properties to the Army.  Jefferson District transferred property requested by the Army pursuant to those agreements.  The Army made permanent use of the property for Canal work, a federal purpose authorized by federal statutes and funded by federal appropriations.  The Army may have been the only entity to enter or use the property.  This relationship "illustrates that the government and [Jefferson District's] actions were 'two coordinate and coordinated parts of the same undertaking.'"  *Id.* at 265-66 (quoting *Hendler v. United States*, 952 F.2d 1364, 1378 (Fed. Cir. 1991)).  Accordingly, direct and substantial United States involvement exists.  The court again rejects the United States' attempt to absolve itself of liability by shifting blame to Louisiana.  "The United States cannot circumvent the requirements of the Takings Clause by asking another sovereign to act on its behalf."  *Id.* at 266 (citations omitted).[14]

_____

[14]As noted in *National Food I* and *Olivier Plantation*, the government and Louisiana have advanced inconsistent legal theories in an attempt to escape liability.  In *Sid-Mars*, the Army argued it took the property.  *See Sid-Mars*, 644 F.3d at 276.  In *Olivier Planation* before the federal district court, the Army initially argued that the plaintiffs' state law taking claims were improper because the claims arose under the Fifth Amendment, as the "inverse condemnation was the result of [the Army's] Congressionally authorized *exercise* of eminent domain on a federal project, independent of the Commandeering Order or Right of Entry."  *Olivier Plantation, LLC v. St. Bernard Parish*, 744 F. Supp. 2d 575, 580-81 (E.D. La. 2010) ("*Olivier Plantation I*") (emphasis added).  Subsequently, the Army opposed district court jurisdiction on the basis that the plaintiffs' claims arose under state law while the state's third-party claim against the Army was proper only in this court.  *Id.* at 581.  In *National Food I*, the Army took the opposite position, arguing that the parish was responsible.  96 Fed. Cl. at 264-65.  The state trial court in *Olivier Plantation II*, citing to both the federal district court's decision and to *National Food I*, described the arguments as "a 'shell game' to hide or obscure a recovery by raising inconsistent defenses in actions pending in different courts tailored only to defeat the claim . . . by passing the responsibility to the empty chair in the respective courtrooms of particular jurisdiction."  *Olivier Plantation II*, at *18.

The Army, however, would be liable for a more basic reason.  Jefferson District appears to have lacked the property interests later exercised by the Army.  If so, then the Army's permanent use of the properties, even if done in good faith, were what took the remaining property interests.  *Cf. National Food I*, 96 Fed. Cl. at 267 ("In sum, the court need not ask whether the [Army's] involvement with the Parish was 'direct and substantial' when it is undisputed that the United States physically entered [the property] and removed [permanently] materials from it for the benefit of the United States' levee rehabilitation efforts.").

The government has not specifically challenged whether the Landowners have stated a claim under a contract theory.  The court finds, however, that such a claim may exist because the Landowners may be third-party intended beneficiaries of agreements between local governments and the United States to compensation private parties whose property was taken, and that the United States may have breached the agreements.  The Federal Circuit "has recognized limited exceptions [to privity of contract] when a party standing outside of privity 'stands in the shoes of a party within privity.'"  *Sullivan v. United States*, 625 F.3d 1378, 1379-80 (Fed. Cir. 2010) (quoting *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1289 (Fed. Cir. 1999)).  The Landowners must be able to stand in the shoes of the local government entities, and show that the United States breached the contract.  *Id.* at 1380-81.  The "'contract must reflect the express or implied intention of the [contracting] parties to benefit the third-party,'" and the third-parties must be identified or fall within a "'class clearly intended to be benefitted.'"  *Id.* at 1380 (quoting *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997) (alteration in original)).  The Landowners' properties were specifically identified as a class.  DX D at 1, Exs. A-C.  These agreements contain clauses requiring identification of, and compensation for, private parties whose property has been taken.  And while the obligations appear primarily to lie with the State, the United States may have been obliged to ensure compensation for the lands it directed the Jefferson District to acquire.  *E.g.*, DX A § III.D; PX 2 § 3; PX 3 § III.D (Supplemental Agreement 2, as amended by Supplemental Agreement 2-A § VII).  Even if the Project Agreement's disclaimer of any third-party rights applies, DX A Art. XIX, other pertinent agreements did not contain such disclaimers.

## CONCLUSION

For the foregoing reasons, the court concludes that the Landowners have sufficiently and plausibly alleged that the taking occurred after March 2012, and accordingly the court possesses jurisdiction to hear the takings claim. As a result, the government's motion to dismiss the complaint for lack of subject-matter jurisdiction is DENIED.[15]  The court further concludes that the Landowners have demonstrated sufficiently that they possessed interests in the property at the time of the alleged taking and that the United States may be responsible, and accordingly, the government's motion to dismiss the complaint for failure to state a claim upon which relief can be granted is also DENIED.

---

[15]The Landowners' Motion for Leave to File First Supplemental Memorandum, ECF No. 26 is GRANTED.

On or before September 6, 2019, the parties shall confer and file a joint status report providing a proposed plan for discovery and other proceedings.

It is so **ORDERED**.


s/ Charles F. Lettow
Charles F. Lettow
Senior Judge